**SIGNED THIS: January 19, 2012**

_____
**Mary P. Gorman
United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re ) | |
| ) | Case No. 09-70050 |
| ALLEN A. TAYEH and ) | |
| KHAWLA A. TAYEH, ) | Chapter 7 |
| ) | |
| Debtors. ) | |
| _____ ) | |
| ) | |
| MECHILLE MANN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No 10-7098 |
| ) | |
| ALLEN A. TAYEH, ) | |
| ) | |
| Defendant. ) | |

# O P I N I O N

This matter is before the Court for decision after trial of an adversary complaint filed against

-1-

Allen A. Tayeh by Mechille Mann to determine the dischargeability of a debt. Ms. Mann claims that Mr. Tayeh owes her over $19,000 because she purchased a vehicle from his used-car dealership but never received clear title to the vehicle and, ultimately, lost the vehicle through repossession by Mr. Tayeh's lender. Because this Court finds that Ms. Mann has proven each element of her complaint by a preponderance of the evidence, a nondischargeable judgment will be entered in her favor.

**Factual and Procedural Background**

Allen A. Tayeh ("Debtor"), along with his wife, Khawla A. Tayeh, filed a voluntary petition under Chapter 7 on January 8, 2009. Although Debtor has been employed full-time for over 25 years as an engineer by the State of Illinois Capital Development Board, he also operated a used-car dealership under the name of Great Buy Motors ("Great Buy") in Springfield, Illinois. Great Buy was owned by the Debtor as a sole proprietorship from February 2003 until it ceased operations in June 2008. During all times relevant here, Debtor oversaw the operations at Great Buy and his son, Adam Tayeh, ran the day-to-day operations of the business and also worked as a used-car salesman.

On November 2, 2007, Mechille Mann purchased a 2005 Ford F-150 ("F-150") truck from Great Buy for $22,000. Adam Tayeh was the salesman acting on behalf of Great Buy for the transaction. Ms. Mann made a $2000 cash down payment on the purchase and also traded in a 2002 Chevrolet Avalanche ("Avalanche") truck in exchange for a $14,000 credit against the purchase price. After adding in taxes and title fees and giving credit for the down payment and trade-in, the written sales agreement showed a balance due from Ms. Mann to Great Buy of $6632. In addition to the sales agreement, Ms. Mann signed the necessary forms for the Illinois Secretary of State to transfer title to the F-150 to her, and she was charged both a "document" fee and a "Title & Plate" fee by Great Buy. The paperwork prepared by Adam Tayeh noted that Great Buy would be the first lienholder on the F-150 title after it was processed into Ms. Mann's name. Although the documents

show the $6632 balance due and the parties agree that amount was, in fact, due, no note was signed to establish formal payment terms for the remaining balance.

Ms. Mann drove the F-150 off the lot of Great Buy but, literally within hours, began to experience problems with the vehicle. She called Adam Tayeh about the problems and he advised her to take the vehicle to a mechanic. She took the F-150 to a local Ford dealership and, on November 3, 2007, paid $999.27 to that dealership for required repairs. She promptly notified Adam Tayeh of the cost of the repairs and he agreed to credit the amount she had paid to her balance due to Great Buy, thereby reducing the balance to $5632.73. Again, the parties made no formal arrangements for payment of that balance.

On November 21, 2007, Ms. Mann and her fiancé were driving the F-150 in Minnesota when they were pulled over by a police officer and questioned about the ownership of the vehicle. According to Ms. Mann, they were informed that the Illinois license plates on the vehicle were still registered to the Avalanche. Further, Ms. Mann was not shown as the titleholder to the F-150. The vehicle was impounded at that time and she was required to pay approximately $300 to retrieve it after presenting all of her paperwork from Great Buy. A similar incident occurred in December 2007 and resulted in additional expense to Ms. Mann to retrieve the F-150 from impound.

On March 10, 2008, the F-150 was impounded a third time, by the City of Minneapolis, and the documents Ms. Mann presented at trial show that the basis for the impound related to a question of vehicle ownership. By that time, the plate originally registered to the traded-in Avalanche had expired and, accordingly, Ms. Mann was unable to immediately retrieve her vehicle from impound. Because she had moved to Minneapolis, she contacted relatives in Illinois for assistance in renewing the license plates. However, in the process, Ms. Mann learned that the documentation to transfer the plates to the F-150 had never been sent to the Illinois Secretary of State. By the time Ms. Mann renewed the plates in Illinois and returned to the Minneapolis impound lot, the F-150 was no longer

there and she was informed that a law enforcement official from Illinois had seized the vehicle.[1]

Ms. Mann contacted Adam Tayeh to complain about the continuing problems establishing her ownership and registration of the vehicle. Adam Tayeh told her that she could bring the vehicle back and trade for something else but that her traded-in Avalanche had been sold so she could not get that back. Later in March, Ms. Mann went to Great Buy and confronted Adam Tayeh about the vehicle. He told her that he did not know where the vehicle was but that he was aware of some law enforcement involvement. Ms. Mann continued to call about the vehicle but never received an adequate explanation from Adam Tayeh about what had occurred. In June 2008, she personally went to Great Buy, but found the lot empty and the business closed.

Ms. Mann continued her investigation and contacted a variety of law enforcement agencies. She testified that she learned from the Illinois Secretary of State Police that Great Buy was under investigation for improper titling of vehicles. Ultimately, she obtained documentation from the Illinois Secretary of State confirming that no paperwork had been processed in Illinois to title the F-150 in her name. She received confirmation from the Iowa Department of Transportation that the title to the F-150 had been transferred some time in 2008 from Great Buy to Footers Auto Sales in Wever, Iowa, and that Footers had since sold the vehicle. She obtained a statement from Footers that it had purchased the F-150 at Morton Auto Auction in Morton, Illinois on September 24, 2008. Ms. Mann also obtained documentation that, in November 2007, Adam Tayeh was charged by the State of Illinois with multiple counts of failing to properly transfer vehicle titles and that he later plead guilty to such charges.

---

[1] Ms. Mann acknowledged at trial that the license plates on the Avalanche were registered to her fiancé's mother, who had previously owned that vehicle. Under such circumstances, Illinois law would not have allowed Ms. Mann to re-register the plates in her name for the F-150. Instead, she would have had to apply for new plates. *See* 625 ILCS 5/3-501, 5/3-504. This problem did not cause the loss of the F-150. If Great Buy had properly transferred title to the F-150, the related application to transfer the plates would have been rejected but new plates could have easily been obtained by Ms. Mann.

At trial, Debtor presented a limited defense to the complaint. He did not call Adam Tayeh as a witness and, accordingly, much of Ms. Mann's testimony and evidence was unrebutted.

Debtor did testify that he believed that the F-150 was impounded in Minnesota by the Federal Bureau of Investigation ("FBI") because Ms. Mann's fiancé was allegedly involved in an illegal drug transaction. Debtor provided no evidence in support of this claim. He said that he had paperwork and letters from his prior attorney showing that he paid money to get the F-150 back from law enforcement authorities, but after he and his attorney shuffled through their papers at counsel table for some time, no letters, cancelled checks, or other paperwork to support the claim were produced.

Debtor also testified that he had made repeated efforts to contact Ms. Mann after her purchase of the F-150. He testified that, because she had moved to Minnesota in January 2008, he had been unable to contact her to make payment arrangements. He did not, however, produce any evidence of any returned letters to contradict Ms. Mann's testimony that she had lived at the same Springfield address for three months after her purchase and had made arrangements for the forwarding of her mail after her move. Debtor did not dispute Ms. Mann's testimony about the numerous calls and visits she had made to Great Buy during the time in question.

Debtor also testified that the reason that title to the F-150 had not been transferred to Ms. Mann in a timely fashion was that, because she had not paid the balance due, one of his floor plan lenders, Automotive Finance Corporation ("AFC"), would not release the title. He testified that the deal with Ms. Mann was that the balance due as shown on the written sales agreement was expected to be paid within days of the sale. Debtor testified that Great Buy rarely financed purchases and, in the few cases when it did, it transferred title to the buyer with Great Buy retaining a lien on the title. Debtor did not dispute that Adam Tayeh had agreed to give Ms. Mann credit for the $999.27 she paid for repairs and admitted that the documents did not set forth any specific date for the balance to be paid. He presented no evidence that, at any time during any of her calls or visits to Great Buy after

the sale, any demand was ever made on her to complete her payments. Further, he admitted that, in fact, the Illinois title application prepared by Adam Tayeh showed Great Buy as a lienholder, indicating an intent to retain a lien to secure payments remaining due on the vehicle.

Debtor admitted that, notwithstanding his initial claim that the FBI had seized the F-150, the F-150 had actually been repossessed by his lender, AFC, and sold at auction. His schedules list AFC as an unsecured creditor owed over $68,000 for amounts still due for vehicles sold which were subject to AFC's lien. Numerous other lenders, including Morton Auto Auction, are also scheduled for debts incurred when vehicles were sold but the lienholders were not paid.

Debtor's schedules do not list Ms. Mann as a creditor, despite her many calls to him seeking compensation for her losses related to the F-150. In fact, Ms. Mann did not learn of the Debtor's bankruptcy filing until sometime in December 2010 when she happened to see Adam Tayeh. She confronted him again about her loss of the F-150, and he admitted that the vehicle had been seized by Great Buy's lender and sold. Adam Tayeh told Ms. Mann to contact the Debtor, but when she did that, she was told of the bankruptcy filing. She filed her adversary complaint, *pro se*, on December 13, 2010. The Debtor raised no defense to her claim based on the timeliness of the filing.

At the conclusion of the trial, the matter was taken under advisement for a review of the exhibits and testimony. The case is ready for decision.

### Jurisdiction

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334. The resolution of issues involving the dischargeability of debts are core proceedings. *See* 28 U.S.C. § 157(b)(2)(I).

### Legal Analysis

Ms. Mann claims that the Debtor obtained property from her by fraud and that his resulting

debt to her should be declared nondischargeable. She relies in her complaint on the provisions of § 523(a)(2)(A) of the Bankruptcy Code, which provide as follows:

> (a) A discharge under section 727…of this title does not discharge an individual debtor from any debt—
>
> * * * *
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

In order to prevail on her claim, Ms. Mann must prove: (1) that the Debtor obtained property from her by making a false representation or omission which he either knew was false or which he made with reckless disregard for the truth; (2) that the Debtor possessed an intent to deceive or defraud her; and (3) that she justifiably relied on the false representations. *See* 11 U.S.C. § 523(a)(2)(A); *Field v. Mans*, 516 U.S. 59, 74-75 (1995); *In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011); *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010). Ms. Mann must prove each element of her claim by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

There is no real dispute that Ms. Mann was the victim of a fraud and that false representations were made to her during the course of her transaction with Great Buy. She purchased a vehicle from Great Buy but never received title to that vehicle. Debtor admits that he did not have the ability to transfer title to Ms. Mann when her down payment and trade-in were accepted. Thus, it was falsely represented to Ms. Mann that the title and transfer paperwork she signed would be processed through the Illinois Secretary of State's office. She was charged document and title and transfer fees by Great Buy which created a representation that the title and license plates would be properly transferred. It

is undisputed that Debtor never attempted to transfer title of the F-150 to Ms. Mann.

Further, the Debtor's operation of his business as evidenced by the transaction with Ms. Mann violated the Illinois Vehicle Code, which provides as follows:

> After a dealer buys a vehicle and holds it for resale, the dealer must procure the certificate of title from the owner or the lienholder. The dealer may hold the certificate until he or she transfers the vehicle to another person. Upon transferring the vehicle to another person, the dealer shall promptly and within 20 days execute the assignment and warranty of title by a dealer, showing the names and addresses of the transferee and of any lienholder holding a security interest created or reserved at the time of the resale, in the spaces provided therefor on the certificate or as the Secretary of State prescribes, and mail or deliver the certificate to the Secretary of State with the transferee's application for a new certificate[.]

625 ILCS 5/3-113(a).

Debtor admitted that he made no attempt to comply with the Illinois Vehicle Code with respect to Ms. Mann's purchase of the F-150. Further, he did not dispute Ms. Mann's evidence that Adam Tayeh had been criminally charged with multiple counts of violating these same provisions. Ms. Mann's evidence established that the charges against Adam Tayeh were filed on November 8, 2007, just days after her purchase.

Debtor raised two defenses to the allegation that he committed fraud in the sale of the F-150 to Ms. Mann. First, he blamed Ms. Mann for failing to pay the entire purchase price on November 2, 2007. However, Ms. Mann testified that she had made an agreement with Adam Tayeh to pay the balance due over time. She did not deny owing the balance but did deny that she had an agreement to pay the sum immediately. Adam Tayeh did not appear as a witness and, therefore, her testimony was unrebutted. Debtor says that Great Buy rarely financed vehicle sales over time and, when it did, a lien would be noted on the title of the purchaser. Here, however, the paperwork prepared for the Illinois Secretary of State shows that a lien was to be retained by Great Buy and, therefore, contradicts the Debtor's testimony that Great Buy was not going to be involved in a payment plan with Ms. Mann.

Second, Debtor says that the fraud was committed by Adam Tayeh and that he should not be held responsible for his son's conduct. The evidence does not support the Debtor's position. Debtor owned Great Buy and, by his own admission, oversaw its operation. Although he disclaims responsibility for his son's actions, Debtor does not deny knowing about the improper sales or the resulting criminal charges. Debtor had the responsibility for complying with the Illinois Vehicle Code provisions which require prompt title transfers and, again by his own admission, he was aware, at least in Ms. Mann's transaction, that the law was not being complied with at Great Buy. He says he tried to contact Ms. Mann numerous times to collect payments but makes no claim that he ever tried to contact her to straighten out the fraudulent transaction.

Debtor cites several Illinois cases which hold that a principal is not always liable for the fraud of an agent. *See, e.g.*, *Zahl v. Krupa*, 399 Ill.App.3d 993, 1012, 927 N.E.2d 262, 278 (2010); *Express Valet, Inc. v. City of Chicago*, 373 Ill.App.3d 838, 852, 869 N.E.2d 964, 977 (2007); *Citizens Savings and Loan Ass'n v. Fischer*, 67 Ill.App.2d 315, 323, 214 N.E.2d 612, 616 (1966). Although each case cited by the Debtor does hold that a principal is not always liable for the fraudulent acts of an agent, each case limited its holding to situations where the principal had no knowledge of or participation in the alleged fraud. Illinois law is clear that one who participates in the fraud is guilty of the fraud. *Citizens Savings and Loan*, 67 Ill.App.2d at 323, 214 N.E.2d at 615-16. Thus, the cases do not support the Debtor's position because, here, the Debtor was involved in the fraud and had knowledge of the fraudulent acts of his son.

Further, for purposes of proving a claim under § 523(a)(2)(A), courts have repeatedly held that a principal can be held responsible for the fraudulent acts of an agent even when the principal has no knowledge of the fraud. *See, e.g., In re Ledford*, 970 F.2d 1556, 1561 (6th Cir. 1992); *In re Luce*, 960 F.2d 1277, 1282 (5th Cir. 1992) (collecting cases); *In re Abrham*, 436 B.R. 530, 537 (N.D. Ill. 2010). And, in a case that arose in this District and is remarkably similar to the one presented

here, a wife who owned a used-car dealership was held to have nondischargeable liability to a dealership customer for the fraudulent conduct of her salesman husband. *See In re Smith*, 98 B.R. 423, 426-27 (Bankr. C.D. Ill. 1989) (Fines, J.). Generally, to establish the nondischargeable liability of a principal for an agent's fraudulent conduct, it must be established that the purported agent was, in fact, an agent and that the fraud occurred within the scope of the principal-agent relationship. *See In re Quinlivan*, 434 F.3d 314, 319 (5th Cir. 2005).

Here, the Debtor did not dispute that his son was employed as a salesperson at Great Buy and, in fact, he acknowledged that his son ran the day-to-day operations of the business. Great Buy's business was the sale of vehicles and, accordingly, there is no dispute that Adam Tayeh's activities in selling Ms. Mann a vehicle from the Great Buy inventory was within the scope of his employment and within the scope of his agency relationship with the Debtor. Debtor operated his business in violation of Illinois law and cannot escape liability because some of the fraud and misconduct was committed by his salesman.

The Debtor participated in the fraud himself and is responsible for the fraudulent conduct of his agent, Adam Tayeh. Ms. Mann proved by a preponderance of the evidence that the Debtor obtained property from her by fraud and misrepresentation.

Next, Ms. Mann must prove that the Debtor acted with an intent to deceive. *In re Howard*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). Because direct proof of fraudulent intent or specific intent to deceive is often unavailable, such intent may be inferred from the circumstances surrounding a transaction. *See In re Kucera*, 373 B.R. 878, 884 (Bankr. C.D. Ill. 2007). "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *In re Jairath*, 259 B.R. 308, 315 (Bankr. N.D. Ill. 2001).

Here, Ms. Mann clearly established that the Debtor was operating Great Buy by offering

vehicles for sale to the public under terms by which he could not comply with the Illinois Vehicle Code and could not pass clear title to the vehicles. The Debtor was operating his business in violation of Illinois law and taking advantage of unsuspecting customers such as Ms. Mann. The evidence established that Ms. Mann's situation was not an isolated incident. Rather, the multiple charges filed against Adam Tayeh just days after Ms. Mann's purchase showed a pattern of conduct in the business operation which evidences an intent to deceive customers into making down payments and trading in vehicles even though Great Buy was not in a position to deliver title to purchased vehicles in exchange.

The Debtor says that he tried to contact Ms. Mann to collect the money he says she owed on the F-150. He did not testify that he was surprised when he learned that she had been sold a vehicle under terms that made compliance with Illinois law impossible. He did not testify that he took any action to undo the transaction or rectify the problem. He went ahead and sold the Avalanche that she traded in and, presumably, spent her $2000 down payment plus the Avalanche proceeds. He did not testify that he used any of the funds to try to clear title with his lender so he could comply with the law and transfer title to the F-150 to Ms. Mann.

Debtor's only defense on this element was, again, his insistence that he was not responsible for the conduct of his son. And, again, this defense is not supported by the facts or the law. Adam Tayeh's misrepresentations that Ms. Mann would be receiving title to the F-150 and his obvious intent to deceive her occurred in the course of Adam Tayeh's agency relationship with the Debtor. Further, the Debtor admitted that he oversaw the business and, as the dealer, he was responsible for compliance with the law. The Debtor was knowingly operating a business where his salesmen, including his son, were making deals in violation of Illinois law. From such circumstances, this Court can infer that the Debtor intended to deceive his customers, including Ms. Mann. She has met her burden of proof on this issue.

The final element of proof required is that Ms. Mann justifiably relied on the Debtor's misrepresentations. "Reliance means the conjunction of a material misrepresentation with causation in fact." *Mayer v. Spanel Intern. Ltd.*, 51 F.3d 670, 676 (7th Cir. 1995); *see also In re Westfall*, 379 B.R. 798, 805 (Bankr. C.D. Ill. 2007).

Ms. Mann testified credibly about her transaction with Great Buy. Nothing about her initial purchase raised any red flags. She had no way of knowing — or even suspecting — that Great Buy was not complying with the law and that she would be caught up in a fraud perpetrated by the Debtor. Further, the Debtor has not contested her proof on this issue. While he denies his responsibility for any wrongdoing, he cannot — and does not — suggest that the fraud was so apparent that she was not justified in her reliance on the representations of his salesman. Finally, her reliance was a cause of her loss. She justifiably trusted that the Debtor and Adam Tayeh would process the paperwork for the title transfer through the Illinois Secretary of State. Her loss occurred because they failed to keep their promises and failed to comply with Illinois law. Ms. Mann has met her burden of proof on this element.

Ms. Mann provided proof that she paid $2000 down on the F-150 and that she agreed to a trade-in value of $14,000 for the Avalanche. She also presented proof that she spent $999.27 for repairs to the F-150 the day after her purchase, and that Adam Tayeh agreed that the repair expenditures would be credited as payments on the F-150. The Debtor disputed none of this evidence and, accordingly, Ms. Mann should be awarded judgment for $16,999.27. Ms. Mann also sought other damages in the amount of $3000, but presented no specific proof of how those amounts were calculated. Because of the lack of evidence with respect to these other damages, those claims must be denied.

**Conclusion**

The Debtor operated his used-car dealership in violation of the Illinois Vehicle Code. He sold vehicles to unsuspecting customers under circumstances where he knew he would not be able to pass title to the vehicles. With respect to Ms. Mann's transaction, he made no attempt to process title to the F-150 she purchased but, nevertheless, accepted her down payment and trade-in. His conduct was fraudulent and his resulting indebtedness to Ms. Mann must be declared nondischargeable. A nondischargeable judgment in favor of Ms. Mann in the amount of $16,999.27 will be entered.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###